IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

---

| | |
|---|---|
| QUALITY JEEP CHRYSLER, INC., n/k/a QUALITY AUTOMOTIVE SALES AND SERVICE, INC., | |
| Plaintiff, | No. 1:10-cv-00900-PJK-RHS |
| vs. | |
| CHRYSLER GROUP, LLC, | |
| Defendant, and | |
| LARRY H. MILLER CORPORATION - ALBUQUERQUE, d/b/a LARRY H. MILLER CHRYSLER JEEP DODGE ALBUQUERQUE, | |
| Necessary Party Defendant. | |

---

MEMORANDUM OPINION AND ORDER

---

THIS MATTER comes on for consideration of pending motions:

• Plaintiff Quality Jeep Chrysler, Inc.'s ("Quality") Motion for Partial Summary Judgment on Its Reinstatement Remedy and To Confirm Arbitration Award filed April 5, 2011 (Doc. 106).  Quality seeks partial summary judgment on Counts I, II, and IV of its amended complaint (Doc. 61).

- Plaintiff Quality's Motion for Summary Judgment on Chrysler's Affirmative Defense That Section 747 Is Unconstitutional filed April 5, 2011 (Doc. 107).
- Chrysler Group LLC's Cross-Motion for Partial Summary Judgment on Counts I, II, and IV of Quality Jeep Chrysler, Inc.'s Amended Complaint filed April 22, 2011 (Doc. 112).

For the reasons below, the court will deny Quality's motion for partial summary judgment as to Counts I and II and grant in part and deny in part Quality's motion as to Count IV.  The court will grant Chrysler's cross-motion for partial summary judgment as to Counts I and II but only to the extent that reinstatement is not a remedy available to Quality.  The court will grant in part and deny in part Chrysler's cross-motion for partial summary judgment as to Count IV.  In view of the court's disposition, the court will deny Quality's motion for summary judgment on Chrysler's affirmative defense as moot.


## Background

This dispute arises out of the bankruptcy proceedings of the predecessor to Chrysler Group, LLC ("New Chrysler") and subsequent federal legislation.  See In re Chrysler LLC (Chrysler I), 405 B.R. 84, 108 (Bankr. S.D.N.Y. 2009), aff'd, 576 F.3d 108 (2d Cir. 2009), vacated, 130 S. Ct. 1015 (2009), dismissed as moot, 592 F.3d 370 (2d Cir. 2010) (per curiam).  Quality commenced this action on

September 25, 2010, against New Chrysler as defendant and Larry H. Miller Corporation ("Miller") as a necessary party defendant.  Doc. 1 (Complaint). Miller was dismissed from the suit pursuant to this court's memorandum opinion and order dated March 22, 2011.  Doc. 99.

The events giving rise to this dispute proceeded as follows.  On April 30, 2009, New Chrysler's predecessor ("Old Chrysler") filed for Chapter 11 bankruptcy protection in the Southern District of New York.  Rather than liquidating, Old Chrysler sold substantially all of its assets to a buyer group (Fiat) that ultimately became New Chrysler.  After the sale was approved by the bankruptcy court, see In re Chrysler, LLC, 405 B.R. 84 (Bankr. S.D.N.Y. 2009), but before it was completed, Old Chrysler sought to reject under 11 U.S.C. § 365(a) the 789 franchise contracts that were not being assumed in the sale, including Quality's.  On June 9, 2009, the bankruptcy court entered an order that allowed rejection of these agreements.  Order Authorizing Rejection, In Re Chrysler, LLC, No. 09-50002 (Bankr. S.D.N.Y. June 9, 2009); see also In re Old Carco LLC, 406 B.R. 180 (Bankr. S.D.N.Y. 2009).  This rejection was effective immediately and removed from Old Chrysler the obligation to perform under the agreements.

The rejected dealers were left to seek damages for breach as if they were prepetition-unsecured creditors.  See 11 U.S.C. § 502(g)(1); In Re Penn Traffic Co., 524 F.3d 373, 379 (2d Cir. 2008) ("Rejection is in effect a decision to breach

3

the contract or lease.").  The judgment approving the sale of substantially all of Old Chrysler's assets was affirmed from the bench by the Second Circuit on June 5, 2009, although the court stayed the closing of the sales transaction pending Supreme Court review.  See In re Chrysler, LLC, 576 F.3d 108 (2d Cir. 2009) (opinion).  On June 9, 2009, the Supreme Court denied application to extend the stay.  The sale was completed on June 10, 2009.  The Supreme Court granted certiorari, vacated the Second Circuit's opinion approving the sale, and remanded with instructions to dismiss the appeal as moot.  Ind. State Police Pension Trust v. Chrysler LLC, 130 S. Ct. 1015 (2009); see In re Chrysler, LLC, 592 F.3d 370 (2d Cir. 2010).

Old Chrysler did not reject its franchise agreement with Zangara Dodge ("Zangara"), a Dodge line-make dealer located in Albuquerque, New Mexico. Zangara was located nearly across the street from Quality.  By the time of the court's approval order, Zangara was closed and insolvent.  Doc. 61 at 4.  Its owner subsequently sold the Dodge franchise agreement to Larry H. Miller Corporation-Albuquerque ("Miller").  Id.  On August 26, 2009, Chrysler entered into a one-year term sales and service agreement for the Chrysler and Jeep lines with Miller, which now holds franchise rights to all three line makes and operates almost across the street from Quality's former sales location.  Id.

General Motors also entered bankruptcy during this period.  Unlike Chrysler Group, New General Motors assumed the dealership agreements of its

4

predecessor, but subject to wind-down provisions.   In re General Motors Corp.,
407 B.R. 463, 513-15 (Bankr. S.D.N.Y. 2009); see 11 U.S.C. § 365(a).  See
generally A. Joseph Warburton, Understanding the Bankruptcies of Chrysler and
General Motors: A Primer, 60 Syracuse L. Rev. 531 (2010).  These wind-down
provisions generally allowed GM dealers to continue to operate until October
2010.  See, e.g., LaBelle Chevrolet, LLC v. General Motors, LLC, 705 F. Supp.
2d 97 (D. Mass. 2010).

   As these cases proceeded through the bankruptcy courts, Congress
considered various measures to address the concerns of disfavored dealerships.
In December 2009, Congress enacted Section 747 of the Consolidated
Appropriations Act of 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3219-21
("Section 747" or "the Act"), which provided a means by which dealerships could
essentially appeal the manufacturers' decisions through a process of alternative
dispute resolution ("ADR") administered by the American Arbitration Association
("AAA").

   Under the Act, a covered dealer is required to elect arbitration within forty
days of the statute's enactment, and all cases must be submitted to the arbitrator
within 180 days.  § 747(d).  The Act provides, "If the arbitrator finds in favor of
a covered dealership, the covered manufacturer shall as soon as practicable, but
not later than 7 business days after receipt of the arbitrator's determination,
provide the dealer a customary and usual letter of intent to enter into a sales and

service agreement."  § 747(e).  The parties agree that New Chrysler is a covered

manufacturer and that Quality is a covered dealership under the Act.

Quality elected to arbitrate and prevailed.  In the portion of the written

determination entitled "Key Facts Relied Upon by the Arbitrator in Making the

Determination," the arbitrator discussed the balance of the equities in connection

to the decisions made to terminate Quality's franchise but retain Zangara:

> "Quality's performance justified retention when terminated and now.
> Zangara was retained and met little, if any, of the criteria for
> retention.  At the time Zangara was retained and Quality was
> terminated, Zangara was a closed and failed dealership.  Quality was
> terminated and Zangara was retained to allow Zangara and Miller to
> make their own consolidation deal or choose not to make a deal.
> Quality's performance justified having that opportunity and choice,
> either at the time of the termination in 2009 or based on current
> circumstances, pursuant to the reinstatement remedy available in this
> arbitration."

Doc. 61 exh. C at 3.  He concluded that "Quality met the performance standards

formally stated and used by Chrysler to decide on termination."  Id.  The

"Determination" portion stated that Quality "shall be reinstated to the Covered

Manufacturer's dealer network."  Id. at 2.  New Chrysler subsequently issued

Quality what New Chrysler asserts is a Section 747-compliant Letter of Intent

("LOI").  Quality alleges that the LOI issued is not customary and usual, and

therefore not compliant with the terms of Section 747, on the grounds that it

"contain[s] requirements that were never imposed on Quality before its

termination, were not imposed on any dealers that assumed or were awarded

franchises after the bankruptcy, and allow[s] Chrysler to prevent Quality's reinstatement."  Doc. 61 at 13.

## Claims at Issue-Jurisdiction

In Counts I, II, and IV of its Amended Complaint, Quality seeks confirmation of the arbitration award in the form of a "judgment in conformity with Arbitrator Jontz' Written Determination and Award, reinstating Quality to the Chrysler dealer network upon the same terms and conditions to which it was subject prior to Old Chrysler's bankruptcy proceeding" (Count I); enforcement of the Act and arbitration award by way of a judgment "that Quality's Jeep and Chrysler franchises and sales and service agreement shall be reinstated, and Chrysler forthwith shall issue [a] letter of intent that promptly will accomplish this result" (Count II); and declaratory judgment that (a) Section 747 requires that Quality be reinstated as a Jeep-Chrysler dealer and that the franchises and sales and service agreement be on the same terms and conditions to which Quality was subject prior to the Old Chrysler bankruptcy; (b) the Act requires New Chrysler to issue a "customary and usual letter of intent" as a result of the Award; (c) the Act prohibits a letter of intent that is unconscionable, onerous, illusory, and/or commercially unreasonable; and (d) New Chrysler has failed to issue a customary and usual letter of intent as required by the act (Count IV).  Chrysler has filed a cross motion for partial summary judgment dismissing these claims.

7

This court's jurisdiction to consider Counts I, II, and portions of Count IV arises under 28 U.S.C. §§ 1331 (federal question) and 2201 (declaratory judgment act). The Declaratory Judgment Act provides, "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The phrase "actual controversy" is synonymous with the case and controversy requirement of Article III, with the term actual serving as emphasis rather than definition. MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007); Surefoot LC v. Sure Foot Corp., 531 F.3d 1236, 1241 (10th Cir. 2008). A court must look at the "underlying facts, assessing whether they suggest an extant controversy between the parties or whether instead they merely call on [the court] to supply an advisory opinion about a hypothetical dispute." Surefoot LC, 531 F.3d at 1242. "The question comes down to whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Columbian Fin. Corp. v. BancInsure, Inc., --- F.3d ----, 2011 WL 2450969, at *4 (10th Cir. 2011) (internal quotation marks and citations omitted). In other words, "[t]he disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what

effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." Pub. Serv Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 244 (1952).

The prerequisites to declaratory judgment jurisdiction surely have been met with respect to Count IV, subparts (a), (b), and (d). First, there is a live controversy over the remedy afforded by Section 747 and whether New Chrysler has complied with its terms. The controversy is between parties having adverse legal interests who are properly aligned and present before the court to argue the controversy. And the controversy remains of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Here there is a specific, tangible dispute that poses significant practical consequences. See Columbian Fin. Corp., 2011 WL 2450969, at *6. Accord Chrysler Group LLC v. South Holland Dodge, Inc., Nos. 10-12984, 10-13290, 10-13908, 2011 WL 1790333, at *14 (E.D. Mich. May 10, 2011).

Quality also seeks a declaration that the Act prohibits a letter of intent that is unconscionable, onerous, illusory, and/or commercially unreasonable. To the extent that Quality alleges that the subject LOI is unconscionable, onerous, illusory, or commercially unreasonable, however, this court lacks jurisdiction to issue a declaratory judgment to this effect because the dispute is premature and "too speculative to warrant [an] anticipatory judicial determination[]." Eccles v. Peoples Bank, 333 U.S. 426, 432 (U.S. 1948); see, e.g., Textron Lycoming

9

<u>Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace & Agric.</u>
<u>Implement Workers of Am., Int'l Union</u>, 523 U.S. 653 (1998) (declaratory
judgment regarding voidability of contract improper absent concrete interest in
defending or challenging its binding nature).  Of course, nothing in the Act
expressly prohibits a letter of intent that is unconscionable, onerous, illusory, or
commercially unreasonable.  But any agreement entered into by the parties may
be subject to other law involving contracts.  Because Quality has not presented its
question in the context of a case or controversy sufficient for adjudication, the
court does not consider any potential questions raised by its allegation.

<u>Discussion</u>

Summary judgment is appropriate if there is no genuine dispute as to any
material fact and the movant is entitled to a judgment as a matter of law.  Fed. R.
Civ. P. 56(a).  The crux of the dispute in this case concerns the remedy afforded
by Section 747.  Counts I and II and portions of Count IV of Quality's Amended
Complaint are predicated on Quality's argument that Section 747 affords the
remedy of reinstatement to Chrysler dealers rejected in bankruptcy.  Therefore, to
the extent that Quality's claims for relief presume the remedy of reinstatement,
Quality's motion for summary judgment must be denied and Chrysler's cross-
motion granted.

Quality asserts that Congress's intent in passing Section 747 was to provide

10

a mechanism for prevailing dealers to be restored to the same franchise relationship and terms they had prior to the bankruptcy.  Doc. 106 at 3. According to Quality, these dealers never should have been terminated in the first place.  Id.  Thus, Quality argues, prevailing in arbitration entitled it to this remedy.

New Chrysler contends that the reinstatement remedy to which Section 747 refers is inapplicable to dealers whose agreements with Old Chrysler were terminated in bankruptcy because (unlike GM, which assumed some dealer contracts) New Chrysler and Quality have never had a contractual relationship, and, thus, there is nothing to "reinstate."  The only remedy available to the dealers, New Chrysler argues, was an opportunity to be added to New Chrysler's network.  New Chrysler further argues that "reinstatement" would violate orders from the bankruptcy court absolving it of any obligation to perform under the earlier agreement, and to that extent would constitute an unconstitutional infringement by Congress on the judiciary's power, see Plaut v. Spendthrift Farm, Inc., 514 U.S. 211 (1995), and a violation of the Bankruptcy Uniformity Clause, U.S. Const. art I., § 8, cl. 4.  Accord J. Michael Morgalis, Comment, Unlawful Reprieve: An Analysis of the Constitutionality of Section 747 of the Consolidated Appropriations Act, 79 U. Cin. L. Rev. 825 (2010).  Quality asserts that adopting its position would not contravene the orders of the bankruptcy court or raise constitutional concerns because Section 747's prospective requirement that New

11

Chrysler contract with Quality on terms "replicating those in Quality's agreement with Old Chrysler," Doc. 107 at 7-8, is conceptually distinct from requiring New Chrysler to assume Quality's former agreement.  The United States as intervenor argues that the court should avoid reaching any constitutional questions by adopting New Chrysler's urged interpretation of Section 747.  Doc. 101-1 at 2.  Of course, "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction; and the canon functions <u>as a means of choosing between them</u>."  <u>Clark v. Martinez</u>, 543 U.S. 371, 385 (2005) (citations omitted)).  "Where . . . Congress' intent is clear, the canon is inapplicable."  <u>Hernandez-Carrera v. Carlson</u>, 547 F.3d 1237, 1245 (10th Cir. 2008) (citation omitted).  Therefore, before analyzing any constitutional issues, the court considers the text of Section 747.  Because the court concludes that the plain language of Section 747 affords only the remedy of addition to New Chrysler's dealer network, it does not address the issues of the constitutionality of Section 747 or waiver.  <u>See</u> Doc. 107 at 2-3.

The Act provides that dealers have the right to seek "continuation, or reinstatement of a franchise agreement, or to be added as a franchisee to the dealer network of the covered manufacturer in the geographical area where the covered dealership was located when its franchise agreement was terminated, not assigned, not renewed, or not continued."  § 747(b).  The sentence that follows

refers expressly to three separate remedies: "continuation, reinstatement, or addition." Id.  Thus Section 747 apparently provides a remedy to three categories of dealers: those whose dealership agreements were still in effect subject to a wind-down agreement, those whose dealership agreements had been assumed but were no longer in effect, and those whose dealership agreements were rejected in bankruptcy.   Quality would fall in the last category as a dealer whose agreement was rejected pursuant to title 11, section 365(a) of the Bankruptcy Code, while dealers whose agreements were assumed in bankruptcy subject to a wind-down agreement would appear to fall in the first two categories.

A close look at the meaning of the term "reinstate" demonstrates the inapplicability of this remedy to Quality.  The prefix "re" signifies one of two meanings: (1) "again: anew" or (2) "back: backward."  Webster's Ninth New Collegiate Dictionary 978 (1991).  Dictionary definitions of "reinstate" allow that the term may encompass either the "again" or "back" significance of the prefix "re":  Webster's defines "reinstate" as "to place again (as in possession or in a former position)," invoking the first usage of the term "re," meaning repetition; alternatively, Webster's defines "reinstate" as "to restore to a previous effective state," invoking the latter use of "re," for a meaning akin to retroactivity.  Id. at 993; see also id. at 1008 (defining the prefix "retro" to mean "backward: back").  Likewise, Black's Law Dictionary 1312 (8th ed. 2004) defines "reinstate" as "[t]o place again in a former state or position; to restore."  Quality urges that

13

effectuation of Section 747 requires injunctive relief placing Quality in its status quo ante position prior to the termination of its dealership. Doc. 106 at 8. The court agrees with Quality concerning the significance of the term "reinstate"; it does not, however, agree that, as used in Section 747, reinstatement possibly could apply to Quality. Quality could not be "placed again" as a dealer in the New Chrysler network because it was not a dealer in the New Chrysler network to begin with; likewise Quality could not be "restor[ed] to [its] previous effective state."

The fact that Quality cannot not be "reinstated" to a relationship with New Chrysler is illustrated by contrasting the structure of the GM bankruptcy, in which dealership agreements were assumed by the surviving entity although subject to wind-down agreements. In those cases, a contractual relationship existed at some point between dealers and New GM. See, e.g., Thys Chevrolet, Inc. v. General Motors LLC, No. 10-CV-46-LRR, 2010 WL 4004328, at *4 (N.D. Iowa Oct. 12, 2010) (reinstatement achieved by "amending the existing Wind-Down Agreement in place between Family Auto and GM"). Quality argues that limiting Chrysler's rejected dealerships to the remedy of addition to the dealer network would render Section 747's use of the term "reinstatement" a nullity; however this is not the case because reinstatement would be available to dealers whose agreements were assumed by New Chrysler prior to their termination.

Quality asserts the contrary–that application of the term "reinstate"

14

necessarily requires that termination occur and that, therefore, reinstatement could apply "only to <u>Chrysler</u> dealers and the few GM dealers terminated outright or prior to expiration of the Act's arbitration demand deadline."  Doc 121 at 12-13 & n.10  ("Subsection 747(b) clearly articulates the remedy as 'reinstatement of the franchise agreement,' which can only be read to refer to the franchise agreement that was 'not assigned' or was 'terminated' by the manufacturer–and which thus clearly includes Chrysler dealers.").  However, reading "reinstatement" to apply to <u>either</u> Chrysler dealers or GM dealers, an interpretation to which the language of Section 747 is equally susceptible, does not render any term obsolete.

Quality also asserts that the availability of reinstatement remedies against successor entities in the context of the NLRB Act and Title VII demonstrates that Congress has "long been familiar with the application of 'reinstatement' remedies to successor entities, notwithstanding their technical lack of a prior contractual or legal relationship with the party to be reinstated."  Doc. 106 at 11.  Both <u>Golden State Bottling Co. v. NLRB</u>, 414 U.S. 168 (1973), and <u>Wheeler v. Snyder Buick, Inc.</u>, 794 F.2d 1228 (7th Cir. 1986), cited by Quality, concern application of and exceptions to the traditional common law of successor non-liability for the torts and debts of a predecessor.  The successor liability line of cases is inapposite, however, because any legal liability under Section 747 exists between New Chrysler and Quality; this is not a case of liability incurred by a since-terminated entity that may extend to a successor.  <u>See, e.g.</u>, <u>Trujillo v.</u>

Longhorn Mfg. Co., 694 F.2d 221, 224-25 (10th Cir. 1982).  Moreover, any

reinstatement remedy afforded by Section 747 is distinct from the reinstatement

of an employee because the remedy under the NLRB Act and Title VII is

retroactive, intended to make a wrongfully terminated employee whole from the

point of the wrongful act to the moment of her reinstatement; for example,

reinstatement under the NLRB Act includes back pay, indicative of the retroactive

effect of such a remedy.  By contrast, Section 747 specifically excludes

retroactive relief such as compensatory, punitive, or exemplary damages.  See

§ 747(e); Doc. 107 at 7-8 ("Quality's position is not that the bankruptcy estate is

liable for an administrative priority claim for breach of an assumed contract, but

rather that [New] Chrysler (as opposed to Old Chrysler or the bankruptcy estate)

is liable under Section 747 and the arbitration award for its failure to contract

with Quality on terms replicating those in Quality's agreement with Old

Chrysler." (alteration in original)).

       The bulk of Quality's arguments that Section 747 entitled it to be returned

to the status quo ante pertain to congressional intent in the passage of Section

747.  Quality relies upon two trial court orders to assert that "[c]ourts have agreed

that Congress's intent was that dealers be provided with the same terms and

conditions with the new manufacturer that they had with the old one."  Doc. 121

at 7.  LaBelle Chevrolet, LLC v. General Motors, LLC, however, which stated

that "[w]hen LaBelle is reinstated, it will remain subject to the same provisions of

the Dealer Agreement to which it was previously bound," 705 F. Supp. 2d at 100, is inapposite here given the distinct circumstances of the GM bankruptcy articulated above.   Los Feliz Ford, Inc. v. Chrysler Group, LLC did not apply Section 747 but rather state law.   See No. 2:10-cv-06077, Order Re: Motion to Dismiss (C.D. Cal. Oct. 27, 2010).   The court opined on the remedy afforded terminated Chrysler dealerships only in the context of determining whether Section 747 operated retroactively to render a terminated dealer a "dealer" under California state dealership laws during the interim following Old Chrysler's bankruptcy but preceding the passage of Section 747.   That court concluded that "a covered dealer's success in arbitration amounts to a determination that it should not have been terminated in the first place. . . . [T]he arbitrator's determination essentially conferred dealership status on [the terminated dealership], and . . . to conclude otherwise would be to extend the denial of state law protections that the arbitration procedure was intended to redress."   Id. at 5. This court respectfully disagrees.   See Doc. 99 at 13.   But, in any event, the import of Section 747 for state dealer laws is not controlling of the issues at hand.

Because the plain language of the statute is unambiguous, this court need not look to extraneous materials to discern its meaning.   It is worth pointing out, however, that contrary to Quality's assertions, the legislative history to Section 747 is at best ambiguous regarding Quality's position and at worst contrary.

In particular, S. 1304, 111th Cong. § 2 (2009) (substantially similar to H.R.

17

2743, 111th Cong. § 3 (2009)), would have provided that "at the request of an automobile dealer, an automobile manufacturer covered under this section shall restore the franchise agreement between that automobile dealer and Chrysler LLC or General Motors Corp. that was in effect prior to the commencement of their respective bankruptcy cases and take assignment of such agreements."  Another bill, H.R. 3170, 111th Cong. § 745(b) (2009) (substantially similar to H.R. 2796, 111th Cong. § 3(b) (2009)) provided that "[a]ny automobile manufacturer with respect to which the Federal Government has a financial or ownership interest (or right to acquire such an interest) shall, to the extent that a valid dealer agreement existing immediately before the date of the commencement of a case under title 11 of the United States Code by such automobile manufacturer is not assumed by or assigned to another automobile manufacturer, require any new entity created in such case to enter into a new dealer agreement with the dealer whose agreement was not so assumed or assigned, and on the same terms as existed immediately before such date." (emphasis added).  An accompanying report stated that this bill was intended "to reinstate the same legal rights of auto dealers to remain in business that they had before the companies filed for bankruptcy."  H.R. Rep. No. 111-202, at 82 (2009).

Perhaps, as urged by Quality, these drafts are indicative of an intent by Congress to circumvent the order of the bankruptcy court and to return the prevailing dealers to a status quo ante position.  Indeed much of the testimony in

Congress leading up to the passage of Section 747 was focused on the structure of the GM and Chrysler bankruptcies and criticism of the approval of these plans. See, e.g., Ramifications of Auto Industry Bankruptcies (Part I): Hearing Before the H. Comm. on the Judiciary, 111th Cong. 4-5 (2009) (statement of Rep. Steve King, Member, Comm. on the Judiciary) (entering into record objection filed in Chrysler bankruptcy case); id. at 77-81 (statement of David A. Skeel, Professor of Law, University of Pennsylvania); id. at 41-43, 88 (statements of Bruce Fein, Principal, The Lichfield Group); id. at 94 (statement of Andrew M. Grossman, Senior Legal Policy Analyst, The Heritage Foundation);  see also Mark J. Roe & David Skeel, Assessing the Chrysler Bankruptcy, 108 Mich. L. Rev. 727 (2010).

But perhaps these drafts instead indicate that Congress discarded language that would effectuate such a purpose in favor of the present approach, particularly given constitutional concerns raised in connection to these drafts by the Congressional Research Service and the Auto Task Force.  See INS v. Cardoza-Fonseca, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend sub silentio to enact statutory language that it has earlier discarded in favor of other language." (internal quotation marks and citation omitted)); Ramifications of Auto Industry Bankruptcies (Part II):  Hearing Before the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary, 111th Cong. 24 (2009) (statement of Ron Bloom, Senior Advisor, U.S. Treasury Dep't)

("[I]t would set a dangerous precedent, potentially raising enormous legal concerns, to say nothing of the substantial financial burden it would place on the companies, to intervene into a completed portion of a judicial bankruptcy proceeding on behalf of one particular group."); Carol Pettit et al., Cong. Research Serv., 7-5700, Mandating Dealership Agreements for Automakers Receiving Federal Funds: Constitutional Analysis (2009) (analyzing constitutionality of proposed bills).  Notably, unlike section 747, none of the abovementioned proposals provided for issuance of an LOI–the very purpose of which is to set out preliminary conditions and prerequisites to a final franchise agreement.   In any event, inquiry into the legislature's motivation into adopting the final language of Section 747 is pure speculation on this legislative record. See Miller v. Comm'r of Internal Revenue, 836 F.2d 1274, 1282 (10th Cir. 1988) (inconclusive legislative history carries little weight).

Quality also urges the Court to rely on the canon that Section 747, as a "remedial statute," should be liberally construed.  See Doc. 121 at 8; see, e.g., Atl. Richfield Co. v. Am. Airlines, Inc., 98 F.3d 564, 570 (10th Cir. 1996).  But while "[t]hat principle may be invoked, in case of ambiguity, to find present rather than absent elements that are essential to operation of a legislative scheme . . . it does not add features that will achieve the statutory 'purposes' more effectively.  Every statute proposes, not only to achieve certain ends, but also to achieve them by particular means–and there is often a considerable legislative

battle over what those means ought to be." <u>Dir., Office of Workers' Comp.</u>
<u>Programs v. Newport News Shipbuilding & Dry Dock Co.</u>, 514 U.S. 122, 135-36
(1995). In this case the parties dispute the means to properly effectuate Section
747, and this canon of interpretation provides little guidance to the court.

Consistent with Section 747 (d) and (e), the issuance of a customary and
usual LOI serves to effectuate the substantive remedy afforded as a result of
arbitration–here, addition to the dealer network as it exists. This is the extent to
which the court grants Quality's motion for summary judgment as to Count IV.
However, it appears that material facts remain with respect to whether the letter
issued by New Chrysler was customary and usual. What remains for trial is
whether the LOI issued in this case was "customary and usual" as required by the
Act.

NOW, THEREFORE, IT IS ORDERED, ADJUDGED and DECREED that:

(1) Plaintiff Quality Jeep Chrysler, Inc.'s ("Quality") Motion for Partial
Summary Judgment on Its Reinstatement Remedy and To Confirm Arbitration
Award filed April 5, 2011 (Doc. 106) is denied in all respects, except that the
court declares that Section 747 of the Act requires Chrysler to issue a customary
and usual letter of intent to enter into a sales and service agreement to a
prevailing dealer in arbitration;

(2) Plaintiff Quality's Motion for Summary Judgment on Chrysler's
Affirmative Defense That Section 747 Is Unconstitutional filed April 5, 2011

(Doc. 107), is denied as moot; and

(3) Defendant Chrysler Group LLC's Cross-Motion for Partial Summary Judgment on Counts I, II, and IV of Quality Jeep Chrysler, Inc.'s Amended Complaint (Doc. 112) filed April 22, 2011 is granted to the extent that the reinstatement remedy Quality seeks is not available.  In all other respects, it is denied.

DATED this <u>18th</u> day of August 2011, at Santa Fe, New Mexico.

_Paul Kelly J._
_____
United States Circuit Judge
Sitting by Designation

Counsel:

Leslie McCarthy Apodaca and Henry M. Bohnhoff, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, New Mexico, and Murray N. Thayer, Albuquerque, New Mexico for Plaintiff Quality Jeep Chrysler, Inc.

Larry J. Montano and Bradford C. Berge, Holland & Hart, LLP, Santa Fe, New Mexico, and Hugh Q. Gottschalk, Wheeler Trigg O'Donnell LLP, Denver, Colorado, for Defendant Chrysler Group, LLC.

Joseph W. Mead, Trial Attorney, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington D.C. and Tony West, Assistant Attorney General, Kenneth J. Gonzales, United States Attorney, Albuquerque, New Mexico, and John R. Griffiths, Assistant Branch Director, Federal Programs Branch, Washington, D.C., for Intervenor United States.